**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**HATTIESBURG DIVISION**

**GODFREY STEPNEY**                                                    **PLAINTIFF**

**VERSUS**                                    **CIVIL ACTION NO. 2:07cv250KS-MTP**

**CITY OF COLUMBIA and DAVID HUBER,**
**in his individual and official capacity**                              **DEFENDANTS**

## Memorandum Opinion and Order

This cause is before the Court on the Motion for Summary Judgment [Doc. # 68]

(December 16, 2009) and memorandum in support [Doc. # 69] filed by Defendant City of

Columbia.   This Motion is opposed by Plaintiff Godfrey Stepney [Docs. # 79 & 80].  Also

before the Court is the Motion for Summary Judgment [Doc. # 70](December 16, 2009) filed by

Defendant David Huber.  This Motion is opposed by Stepney.  [Doc. # 76].  The court, having

reviewed the motion, the responses, the pleadings and exhibits on file and being otherwise fully

advised in the premises, finds as follows:

## I. Background

Stepney brings several claims against Officer Huber and the City of Columbia arising

from Officer Huber's conduct.  Huber is alleged to have forcibly removed Stepney from his car

and to have violently thrown him to the ground after conducting a traffic stop of Stepney's

vehicle.  The parties disagree about the chain of events that occurred on the day in question.

Given the posture of the case, however, the Court must view disputed facts in a light most

favorable to Stepney.

1

On October 14, 2004, the day of the altercation, Stepney agreed to meet a friend, Mary Gardner, at the Columbia fire station so that Ms. Gardner could borrow five dollars. When Stepney arrived, Ms. Gardner was already there, so Stepney pulled his car beside her car in the station's driveway so that he could pass the money through his car window. Officer Huber arrived on scene and instructed Stepney to move. According to Stepney, he complied with Officer Huber's instructions after a brief "verbal exchange," and drove off without speeding or otherwise operating the vehicle in an unlawful manner. Officer Huber nonetheless initiated a traffic stop, presumably on the grounds of a (subsequently dismissed) charge of misdemeanor careless driving. After Stepney had stopped, Officer Huber "approached Stepney's vehicle, opened the door of Stepney's vehicle, pulled Stepney out and violently threw him to the ground . . . ." Pl.'s Amend. Compl. ¶ 7 [Doc. # 34] (February 5, 2009). Officer Huber's actions caused "Stepney to sustain physical and other injuries." *Id.* Stepney claims that he did not attempt to evade or resist arrest or otherwise refuse to comply with Officer Huber's instructions. Stepney admits that Officer Huber asked him at least twice to step out of the car, but contends that he was not given enough time to comply. He testified that during this time he was unfastening his seatbelt and getting his driver's license out of his pocket. Several witnesses have come forward that witnessed Huber "forcibly and forcefully remove Stepney from the vehicle." Pl.'s Resp. 11 [Doc. # 76].

Officer Huber's version of events drastically differs. He claims that Stepney's attitude at the fire station was "confrontational" and that he failed to immediately comply with the Officer's orders to move his vehicle from the fire station. He insists that this conduct alone was "disorderly conduct" and justified arrest. In his affidavit, Huber states that he asked Stepney to

exit his car at the fire station, and that Stepney drove away in violation of this order. Huber Aff. ¶ 8. He avers that "Stepney's driving as he left the station was careless as he drove in excess of the posted speed limit, crossed the center line on several occasions while on Eagle Day Drive and was using his cellular phone while driving." *Id.* ¶ 9. Finally, he claims that Stepney was passively resisting arrest by refusing to exit the car after Huber and McKenzie, the other officer who had been called as back-up to the scene, had requested that he do so. Huber further disputes that Stepney was violently thrown to the ground, insisting instead that Stepney fell to the ground due to a hip injury caused by his foot being stuck under the brake pedal while Huber was attempting to remove him from the car.

Following the incident, the police department conducted its own investigation of the events. The Chief of Police Joe Van Parkman listed Huber's violations of department policies in an Internal Affairs Investigation memorandum. Pl.'s Resp. Mem., Ex. B [Doc. # 76-3]. It found that Huber failed to advise headquarters of his arrival at the fire station, that Huber used "careless driving" as a pretext to stop Stepney for the verbal exchange at the fire station, that a "disorderly conduct" charge would not stand as Stepney complied with officer's orders by leaving the fire station within a minute, that Huber used unnecessary force at the second stop as Stepney was in the process of complying with Huber's orders to exit his vehicle, and that Stepney failed to record the traffic stop despite fully functional audio/video equipment. Based on the department's findings, the city terminated Huber's employment.

The City of Columbia hired Huber as a law enforcement officer on September 4, 2002. City's Br. Supp. Mot. Summ. J. 14 [Doc. # 69]. Before hiring Huber, the police department conducted a background check, including a criminal check and contacting his previous

employer. *Id.* Huber graduated from the police academy in December of 2002 and was certified as a police officer by the state of Mississippi under MISS. CODE ANN. § 45-6-11 (1972) on January 9, 2003. *Id.* He also had previous juvenile detention officer training, OC spray training, breath analysis for alcohol detection training, and various qualifications with various models of fire arms. City's Mot., Ex. H [Doc. # 68-11]. Huber further testifies that during his employment he spent significant time in the field training with another officer and that he attended other mandatory training sessions provided through Pearl River Community College. Ex. M [Doc. # 68-14]. Huber was given a copy of the Standard Operating Procedure Manual ("SOPM") which discussed officer ethics, rules of conduct, and arrest procedures. *See* City's Mem. Supp. Summ. J., Ex. L [Doc. # 68-13]. However, the city did not maintain records as to whether Huber read and understood the contents of the Manual, or whether he attended the mandatory training sessions. Further, no evidence has been presented that the training sessions covered the topic of excessive force or proper arrest procedures.

The department disciplined or counseled Huber several times over the course of his employment. Huber had three car incidents in a one year period and was dealing with family, mental, and emotional issues. At one point, the Chief made an appointment for Huber with a mental health professional to address some of his issues, but Huber did not show up at the scheduled time. *See* Pl.'s Reply Mem. 12-14 & Ex. M [Doc. # 80]. As previously stated, Huber was terminated by the City of Columbia's Board of Aldermen following an internal affairs investigation into the incident here at issue. *See* City's Mot. Summ. J., Ex. D [Doc. # 68-5].

Stepney filed suit on October 11, 2007. Stepney alleges claims under 42 U.S.C. § 1983 against Officer Huber and the City of Columbia. Stepney contends that Huber used excessive

force in violation of his Fourth Amendment rights when he forcefully removed him from his vehicle. Stepney contends that at all times, Huber was acting as an agent and employee of City of Columbia and was acting in the scope and course of his employment. Stepney alleges that the City of Columbia improperly hired Huber, and that the City subsequently failed to train, supervise, and discipline him. All Mississippi state law claims against both the City of Columbia and Huber were dismissed. *See* Agreed Order Dismissing Pl.'s State Law Claims Against Defendants [Doc. # 91].

## II. STANDARD OF REVIEW

The Federal Rules of Civil Procedure, Rule 56(c) authorizes summary judgment where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986). The existence of a material question of fact is itself a question of law that the district court is bound to consider before granting summary judgment. *John v. State of La. (Bd. of T. for State C. & U.)*, 757 F.2d 698, 712 (5th Cir. 1985).

A Judge's function at the summary judgment stage is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986).

Although Rule 56 is peculiarly adapted to the disposition of legal questions, it is not

limited to that role. *Prof'l Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis*, 799 F.2d 218, 222 (5th Cir. 1986). "The mere existence of a disputed factual issue, therefore, does not foreclose summary judgment. The dispute must be genuine, and the facts must be material." *Id.* "With regard to 'materiality', only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment." *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 272 (5th Cir. 1987). Where "the summary judgment evidence establishes that one of the essential elements of the plaintiff's cause of action does not exist as a matter of law, . . . all other contested issues of fact are rendered immaterial. *See Celotex*, 477 U.S. at 323; *Topalian v. Ehrman*, 954 F.2d 1125, 1138 (5th Cir. 1992). In making its determinations of fact on a motion for summary judgment, the Court must view the evidence submitted by the parties in a light most favorable to the non-moving party. *McPherson v. Rankin*, 736 F.2d 175, 178 (5th Cir. 1984).

The moving party has the duty to demonstrate the lack of a genuine issue of material fact and the appropriateness of judgment as a matter of law to prevail on his motion. *Union Planters Nat'l Leasing v. Woods*, 687 F.2d 117 (5th Cir. 1982). The movant accomplishes this by informing the court of the basis of its motion, and by identifying portions of the record which highlight the absence of genuine factual issues. *Topalian*, 954 F.2d at 1131.

Once a properly supported motion for summary judgment is presented, the nonmoving party must rebut with "significant probative" evidence. *Ferguson v. Nat'l Broad. Co., Inc.*, 584 F.2d 111, 114 (5th Cir. 1978). In other words, "the nonmoving litigant is required to bring forward 'significant probative evidence' demonstrating the existence of a triable issue of fact." *In Re Mun. Bond Reporting Antitrust Lit.*, 672 F.2d 436, 440 (5th Cir. 1982). To defend against a

proper summary judgment motion, one may not rely on mere denial of material facts nor on unsworn allegations in the pleadings or arguments and assertions in briefs or legal memoranda. The nonmoving party's response, by affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial. FED.R.CIV.P. 56(e); s*ee also Union Planters Nat'l Leasing*, 687 F.2d at 119.

While generally "[t]he burden to discover a genuine issue of fact is not on [the] court," *Topalian* 954 F.2d at 1137, "Rule 56 does not distinguish between documents merely filed and those singled out by counsel for special attention-the court must consider both before granting a summary judgment." *John*, 757 F.2d at 712 (quoting *Keiser v. Coliseum Prop., Inc.*, 614 F.2d 406, 410 (5th Cir. 1980)).

## III. LAW AND APPLICATION

### A. David Huber

Stepney seeks liability against Huber under 42 U.S.C. § 1983 for violating the Fourth Amendment prohibition against excessive force. 42 U.S.C. § 1983 holds persons acting under the color of state law liable for actions that deprive another of his Constitutional rights, privileges, or immunities. "[T]o state a violation of the Fourth Amendment prohibition on excessive force, the plaintiff must allege: (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need, and (3) the use of force that was objectively unreasonable." *Bush v. Strain,* 513 F.3d 492, 500-01 (5th Cir. 2008).

Huber contends he is entitled to summary judgment because he is immune from suit under qualified immunity. He also argues that the claim must fail because Stepney has not

created a genuine issue of material fact that Huber's force caused Stepney's injury and not Stepney's foot being caught under the car's pedals. Each argument is addressed in turn.

**1. Qualified Immunity Under Federal Law**

To determine if qualified immunity applies, the court conducts a two-pronged inquiry. *McClendon v. City of Columbia*, 305 F.3d 314, 322 (5th Cir. 2002) (en banc) (per curiam). Qualified immunity shields the state actor unless the plaintiff has presented a sufficient factual basis for a reasonable jury to conclude that (1) the individual's conduct violates clearly established statutory or constitutional rights, *id.* at 323*; see also McIntosh v. Partridge,* 540 F.3d 315, 323 n.8 (5th Cir. 2008) (citing *Bolton v. City of Dallas,* 472 F.3d 261, 265-66 (5th Cir. 2006)), and (2) his conduct was objectively unreasonable in light of the clearly established law. *McClendon,* 305 F.3d at 323. "When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense." *Id*.

Huber does not dispute that Stepney was "seized" at the scene or that "citizens who are the subject of a seizure do have a clearly established right to be free from the use of excessive force at the hands of a law enforcement officer." Mot. Summ. J ¶ 7 (citing *U.S. v. Estrada,* 459 F.3d 627,630 (5th Cir. 2006)). Stepney has presented facts from which a reasonable jury could conclude that an unconstitutionally excessive amount of force was used during his arrest. In sum, Stepney contends that Huber physically pulled him from his car to make an arrest, despite Stepney's compliance with traffic laws and Huber's requests. Therefore, Stepney has satisfied the first prong of the test for qualified immunity. However, Huber contends that his alleged conduct was objectively reasonable under clearly established law. *Id.* ¶ 8.

Under Stepney's version of the events surrounding the arrest, Huber's actions were objectively unreasonable. When considering the objective reasonableness of the force used during an arrest, the Court should consider the facts and circumstances in the particular case. *Bush*, 513 F.3d at 501. "Specifically, the court should consider 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "[A] defendant's violation of constitutional rights can still be objectively reasonable if the contours of the constitutional right at issue are sufficiently unclear." *Id.* (citing *Saucier v. Katz*, 533 U.S.194 204-206 (2001)). In considering the circumstances of the particular arrest, the Fifth Circuit has stated:

> Courts must judge the reasonableness of an officer's conduct by taking into account the " 'tense, uncertain, and rapidly evolving' " circumstances in which officers must often " 'make split-second judgments ... about the amount of force that is necessary in a particular situation.' " From this "on-scene perspective" rather than the " '20/20 vision of hindsight,' " courts should examine the objective reasonableness of an officer's belief that a certain degree of force was lawful under the circumstances.

*Id.* at 502 (citing *Saucier*, 533 U.S. at 205).

First, as the Court previously stated, even if Huber believed that Stepney's arrest was appropriate for the misdemeanor of careless driving, the crime was "utterly non-severe." However, taking the facts in the light most favorable to Stepney, the only offense was blocking the fire station, an offense that was cured when Stepney complied with Huber's orders to move his car. Stepney avers that he complied with the officer's request to move from the fire station's driveway after only a brief exchange with Officer Huber. He denies driving carelessly after the fire station and before being pulled over by Huber. In its review, the police department

determined that the careless driving charge was merely a pretextual basis for the arrest. Again, the severity of the offense for temporarily blocking a fire station is slight, and the need for force would be minuscule, particularly since Stepney complied with Huber's orders to move. Secondly, the evidence presented by Stepney creates a material issue of genuine fact whether a threat to the safety of the officers and others existed at all. In Stepney's version of the facts, he was complying with all traffic laws when he was pulled over and was therefore not a threat to the public. There is no evidence that the police were threatened in any way. Finally, Stepney was not actively resisting arrest or attempting to evade arrest by flight. To the contrary, Stepney pulled over, unfastened his seatbelt, and removed his license for presentation to the officers. At most, Huber claims that Stepney was "passively" resisting arrest and made no effort to comply with his orders to get out of the vehicle. However, viewing the facts as the Court must in a light most favorable to the non-moving party, Stepney was not resisting arrest either actively or passively, but merely had not yet had time to comply with Huber's orders. In sum, Stepney has presented evidence of his version of the events under which a reasonable officer in similar circumstances would view the amount of force used as excessive and unlawful. Therefore, Stepney is not immune from suit.

### 2. Causation

Finally, Stepney has presented sufficient evidence that the injury "resulted directly and only from the use of force that was excessive to the need" as required to prove excessive force. *See Bush,* 513 F.3d at 501. Stepney admits that his foot was caught under the pedals as Huber pulled him from his car which Huber contends was the direct cause of the injury. However, a

reasonable jury could conclude that Huber's force was the direct cause of the injury, without which Stepney would not have broken his hip. Certainly it is difficult to imagine how someone could break his hip from having his foot under the car pedals without any other forces acting upon him. In sum, a reasonable jury has sufficient evidence to conclude that Stepney's injury resulted "directly and only" from Huber's force.

## B. City of Columbia

Municipalities are included among those persons to whom § 1983 applies. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). However, the constitutional tort must result from official municipality policy and not merely under a *respondeat superior* theory. *Id.* "Official policies" can either be unconstitutional on its face, or a policy adopted "with deliberate indifference to the known or obvious fact that such constitutional violations would result." *James v. Harris County*, 577 F.3d 612 (5th Cir. 2009). "[A] widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy'" may also be considered official policy so long as the authorized policymaker has acquiesced in or ratified, condoned, or adopted the unofficial policy. *Id.* (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)). Finally, the policy must also be "the moving force behind, or the actual cause of, the constitutional injury." *Id.* Isolated unconstitutional actions by municipal employees will almost never trigger liability. *Piotrowski v. City of Houston*, 237 F.3d 567, 581 (5th Cir. 2001). Instead, the plaintiff must generally show "a pattern of similar incidents in which citizens were injured or endangered by intentional or negligent police misconduct and/or that serious incompetence or misbehavior was general or widespread

throughout the police force." *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992).

"'The failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.'" *Brown v. Bryan County, OK*, 219 F.3d 450, 453 (5th Cir. 2000), *cert. denied*, 532 U.S. 1007 (quoting *City of Canton v. Harris*, 489 U.S. 378 (1989)). "A plaintiff may demonstrate municipal liability based on . . . a custom or policy of inadequate training, supervision, discipline, screening, or hiring." *Snow v. City of El Paso, Texas*, 501 F.Supp.2d 826,831 (W.D. Tex. 2006) (citing *Monell v. City of New York Dep't of Soc. Servs*., 436 U.S. 658, 694 (1978)).

"[U]nder certain circumstances, § 1983 liability can attach for a single decision not to train an individual officer even where there has been no pattern of previous constitutional violations." *Brown,* 219 F.3d at 459. "[W]ith respect to specific officers, a need for more or different training can be so obvious and the inadequacy of training so likely to result in a violation of constitutional rights that the city can reasonably be said to have been deliberately indifferent to the need for training." *Id.* (citing *City of Canton*, 489 U.S. at 390)). The Fifth Circuit has recognized this single incident exception only when the plaintiff shows "that the highly predictable consequence of the failure to train or supervise resulted in the exact injury suffered by the plaintiff, and that this failure to train or supervise was the moving force that had a specific causal connection to the constitutional injury" *Thomas v. Provou*, 2008 WL 111293 at *7 (S.D. Miss. January 8, 2008) (citing *Brown*, 219 F.3d at 461).

In *Brown*, for example, the Court noted several background facts from which a reasonable jury could have concluded that the sheriff's department was on notice that one of its reserve deputies would likely use excessive force. *Brown,* 219 F.3d at 454-55. In this case, the

reserve deputy was twenty-one years old and inexperienced in law enforcement. *Id.* at 454. In the two years before joining the department, he had been arrested for "assault and battery, resisting arrest, public drunkenness, driving while intoxicated, possession of false identification, driving with a suspended license, and nine moving traffic violations" and he had an outstanding warrant for his arrest at the time he was hired for being in violation of his probation. *Id.* at 454-55. While on the job, the deputy had been involved in a number of "takedown" arrests similar to the one at issue in the case. *Id.* at 455. Although the department had a practice of hiring full-time deputies who had completed a law enforcement education and training program, there was no such showing that reserve deputies were required to have this training. *Id.* The department itself did not provide training other than *ad hoc* on-the-job training and access to television training programs. *Id.* Finally, the department did not provide guidelines to its other officers about how to supervise the untrained reserve deputies. *Id.* at 456. Based on a review of these facts, the Fifth Circuit upheld the jury's conclusion that the county was liable under § 1983 because the department's training policy was so inadequate as to demonstrate deliberate indifference to the need for training and that the inadequate training was a moving force in the constitutional injury suffered by an unarmed civilian. *Id.* at 453.

In contrast, the Fifth Circuit in *Estate of Davis* found that qualified immunity would apply to an officer's supervisors because the officer did not have a "pattern of excessive force against a third party." *Estate of Davis ex. rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 385 (5th Cir. 2005) In *Estate of Davis*, a background investigation by the department had revealed a propensity for violence, a citizen had complained to the department that during a traffic stop the officer acted "like a pycho" and was "going to kill somebody," and a SWAT team

member had reported that he inappropriately used his gun during training exercises. *Id.* at 382.

The Fifth Circuit noted that while the officer in *Estate of Davis* had committed some "'bad' or

unwise acts" they did not involve excessive use of force and injury to a third party. *Id.* at 383.

The Fifth Circuit contrasted a First Circuit case in which supervisors were denied the protection

of qualified immunity for re-arming an officer with an extensive history of violent and

threatening behavior. *See Estate of Davis ex. rel. McCully v. City of North Richland Hills*, 406

F.3d 375, 385 (5th Cir. 2005) (citing *Camilo-Robles v. Hoyos,* 151 F.3d 1 (1st Cir. 1998)) . In

*Camilo-Robles*, the officer had a record that contained at least eighteen "disciplinary infractions

involving violent and/or threatening behavior" including many involving "unwarranted

brandishing of his weapon," and a "known history of assaulting his wife, holding hostages at

gunpoint at the police station, assaulting another civilian, and shooting two law-abiding

neighborhood residents." *Id.*


## 1. Official Policy: Use of Excessive Force

Stepney has not presented any evidence that the Columbia Police Department ("CPD")

had an official policy or custom allowing the use of excessive force. The Plaintiff has not

alleged any other instances or allegations of excessive force involving Huber or any other CPD

officer. To the contrary, the SOPM specifically instructs officers on arrest procedures including

procedures for those resisting arrest. Further, in response to what it deemed to be excessive

force, CPD terminated Huber's employment, showing that they did not ratify or adopt the

behavior. Stepney relies on the deposition testimony of Major Evans to show that Huber's

actions were consistent with CPD's policy and procedure. Major Evans, the *de facto* Chief of

Police, testified that removing a person from his vehicle, and subduing and arresting him is consistent with CPD practices if they have failed to comply with two requests to exit the vehicle. Pl.'s Resp Mot. Summ. J. 16 [Doc. # 80].[1]  Upon review of the deposition, Major Evans was presented with several different scenarios during his deposition.  Tellingly, neither the question or answer on forcibly removing someone from the car clarifies the severity of the crime that justified the arrest.  Indeed, the portion of the deposition given in Stepney's exhibit and quoted below tells a different story:

> Q.  Can you think of a scenario under which an officer would be justified in placing his hands on a citizen and removing him from his vehicle?
>
> A.  Well, unless an officer seen [sic], you know, a – show a gun or something like

---

[1]The portion of Evans' deposition cited in Stepney's memorandum is not included in the cited Exhibit M.  However, the relevant portion of Evans' deposition was cited in Huber's Summary Judgment Rebuttal Memorandum, as follows:

> Q.  Have you ever asked anyone to step from a vehicle and they did not comply?
> A.  Yes, sir.
> Q.  And did you ever assist them in getting out of the vehicle after they did not comply?
> A. Yes, I have.
> Q.  If you asked someone once and they did not get out, what would you do?
> A.  Well, that's a failure to comply with a law enforcement officer.
> Q.  Would you put your hands on them and help them out then?
> A.  Yes, sir.
> Q.  Okay. So if you asked them twice --would you ever get to asking them twice, or if they didn't comply [sic] they were coming out?
> A. Well, I gently, you know, ask the first time. Then if they don't acknowledge, maybe they didn't hear you, you know, and ask them again; and if they don't comply then...
> Q.  And if they made no effort to assist you in getting out of the vehicle, would you pull them completely out of the vehicle, subdue them and put them under arrest?
> A.  Yes, sir.

Exhibit A [Doc. # 84-2].

that, you know, a threatening manner.  You know, that'll be a justifiable reason
there.

Q. But short of some threat or some potential violence, you couldn't imagine a
scenario?

A.  No, sir.

Pl.'s Resp., Ex. M, Evans' Dep. at 56-57 [Doc. # 79-14].  That Major Evans can imagine a

circumstance where a forceful arrest of a person may be necessary when the suspect is ignoring

an officer's request to exit a vehicle is not proof of a department-wide acceptance of the use of

excessive force in the case of all misdemeanors, or more importantly, under the facts presented

in this case.  Therefore, Stepney has failed to establish evidence to suggest that the CPD is liable

for Huber's injuries because of its allegedly insufficient policies of the use of excessive force.


### 2.  Official Policy: Hiring, Training, Supervision, and Discipline

Nor has Stepney presented evidence that the department had an official or informal

policy of inadequate training, supervision, discipline, or uninformed hiring that caused the

alleged constitutional violation.  New officers are subject to a background check, are required to

be certified per MISS. CODE ANN. § 45-6-11 (requiring certification and other qualifications as

set by Board on Law Enforcement Officer Standards and Training for law enforcement officer

employment), and once on the job, participate in on-the-job field training and mandatory training

meetings.  Also, CPD had a clear chain of command for supervision, delegating supervision of

patrol officers to the shift's captain and sergeant.  *See* City's Mem. Supp. Summ. J. 16 [Doc. #

69].

Stepney relies on a list of alleged shortcomings within the CPD as outlined by Dennis

Waller, his expert in police policy, procedure, and practice.  *See* Pl.'s Resp. Mot. Summ. J., Ex. Q [Doc. # 79-17].  In summary, he alleges that the CPD:

1) did not have a system in place to handle its officers' mental and emotional issues;

2) did not provide practical or useful guidelines as to what actions constituted excessive force, but instead, provided only a conclusory statement in its SOPM that excessive force was prohibited;

3) did not provide in-depth training on the contents of the SOPM, but instead merely handed it out and told officers to read it;

4) did not have a "formal, structured, documented field training program for new CPD officers consistent with national accepted standards of police training and practice."  Pl.'s Resp. Mot. Summ. J., Ex. Q at 8 [Doc. # 79-17]; and finally,

5) did not conduct mental or emotional evaluations, but instead conducted "minimal or superficial background checks" on new officers.  *Id.*

Stepney also relies on Huber's own testimony that he believed his actions were within the bounds of CPD's policies and procedures.  *Id.* at 12.

While Stepney has presented evidence of possible shortcomings in the hiring, training, supervision, and discipline at the CPD, he has failed to show how the absence of these procedures would so obviously lead to the use of excessive force.  The summary judgment standard requires the plaintiff to present relevant, material evidence of each element of its claim, not just any evidence.   To be actionable the CPD's policy must have disregarded implementation of these policies "with deliberate indifference to the known or obvious fact" that it would lead to excessive force in violation of the Fourth Amendment.  In this case, the CPD

reiterated its prohibition on the use of excessive force in its SOPM and required police academy certification, which, according to Huber's own testimony, included training as to the prohibition of excessive force. *Id.* at 12. There is no evidence that the use of excessive force was a systemic, widespread problem at the CPD, requiring additional training above and beyond what was offered. Without notice of a problem, it is difficult to imagine how the CPD could have been deliberately indifferent to the need for more or better training. Nor has the plaintiff demonstrated how failure to keep better training records shows deliberate indifference to the risk of excessive force or that improper force in an arrest is the "highly predictable consequence" of the failure to keep adequate training records. Finally, Stepney does not show how the CDP's failure to detect and address mental or emotional issues amounted to reckless disregard of citizen's constitutional rights. No evidence has been put forth that mental evaluations would generally reveal a propensity to use excessive force or that all officers who use excessive force do so because of mental health issues. In sum, while the policies and procedures of the CPD may be sub-par, Stepney has failed to present evidence that they were implemented with reckless disregard for the obvious consequence of the use of excessive force.

Stepney has also failed to show that the lack of these procedures or policies was the "moving force" in the actual injury that occurred in this case. Here, provides no more than a tenuous link between the CPD's policies and Huber's use of improper arrest procedures. For these reasons, Stepney has not met his burden in demonstrating that a jury could find that CPD is liable for Huber's injuries because of its employment policies and procedures.

### 3. Single Incident Exception

Finally, Stepney asserts that Huber's behavior while employed with the department should have informed the department of the need to specially train and supervise Huber. Stepney cites numerous incidents involving Huber over the course of his employment, including:

1) Huber's self-reported anxiety and mental and emotional issues springing from his role as a new father and his desire not to become "drinking buddies" with other officers;

2) driving his patrol car too fast when responding to a 911 call;

3) two minor car accidents, including a January 2003 accident which occurred when Huber's police car slipped in pine straw and went into a ditch when he attempted to turn his car around to retrieve his citation book which he left on the top of the truck;

4) an August 2003 car accident in which he drove his car off an enbankment into a ditch when he diverted his attention to his phone to call dispatch which resulted in suspension for operating a police vehicle in a "careless and reckless manner, thus endangering the lives of yourself and a passenger, Officer Steve Mercier"

5) the Sergeant's decision to relieve Huber of his weapon directly following the August 2003 vehicle incident because he was "shaking" and was not "in his right state of mind. . . to be driving or handling his weapon;"

6) Major Evans' counseling of Huber following this vehicle incident because of his "outraged state" and his loss of control over his emotions, and the sergeant's recommendation that he seek professional help; and

7) his failure to attend the mental counseling session that the Chief subsequently made on Huber's behalf.

*See* Pl.'s  Resp. Mot. Summ. J., Exs. Q & P [Docs. ## 79-17 & 82].  Additionally, Stepney cites

Major Evans' testimony that he believed that Huber's mental and emotional state should have been a warning about his ability to patrol the streets or to remain on the force. *Id.* at 10.

Again, despite his less than stellar job performance, Huber received the training mandated by the state, did not have a significant criminal record, and had no prior incidents or reports of excessive force. Unlike the officer in *Brown*, he did not have a documented history of "take-down" arrests or any other record of violent behavior or crimes. Huber's record for violent acts does not even match that of the officer in *Estate of Davis*. Notably, his employment history does not reveal a single incident of failure to follow arrest procedures prior to the incident involving Stepney or any incident resulting in injury to a third person. His prior conduct and disciplinary actions have no demonstrated relation to the appropriate level of force necessary to arrest an individual. An officer's struggle with family issues and a record of chronic distracted and careless driving does not make it "so obvious" that he will violate constitutional rights of others that it amounts to deliberate indifference on behalf of the department if they fail to respond. None of the above incidents are sufficiently related to arrest procedures or the amount of force that is necessary or sufficient when affecting an arrest.

## IV. CONCLUSION

Plaintiff has presented sufficient evidence to create a jury issue as to whether Huber used excessive force in violation of the Fourth Amendment while acting under the color of state law. Because Stepney has presented some evidence that Huber's conduct violated constitutional rights and that his conduct was objectively unreasonable under clearly established law, Huber is not entitled to qualified immunity. Stepney has also presented sufficient evidence that his injury

resulted directly from the force that was excessive to the need.   Therefore, Huber's motion for summary judgment is **DENIED**.

Plaintiff has not presented any evidence that the City of Columbia had an official policy or custom ratifying the use of excessive force.  Further, Plaintiff has presented no evidence that its policies on hiring, training, supervision, and discipline were adopted with deliberate indifference to the known or obvious fact that constitutional violations would result.  Lastly, Plaintiff has not presented any evidence that Huber's prior behavior while employed by the CPD made it so obvious that a constitutional violation was likely that they could be said to have deliberately disregarded the need for additional training specifically for Huber.  Therefore, the City of Columbia's motion for summary judgment is **GRANTED**.


SO ORDERED AND ADJUDGED this the 9th day of March, 2010.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE